# Court of Appeals, State of Michigan

# ORDER

IN RE A. K. DIXON, MINOR

Docket No.    363388

LC No.        21-137495-NA

Elizabeth L. Gleicher
Presiding Judge

Colleen A. O'Brien

Allie Greenleaf Maldonado

Judges

Respondent's motion for reconsideration is GRANTED in part and DENIED in part, and this Court's opinion issued on April 20, is hereby VACATED. A new opinion is attached to this order.

Respondent contends that this Court should "revers[e] the trial court's order authorizing the petition," asserting that the trial court identified an inapplicable ground for taking jurisdiction. Respondent did not appeal the trial court's acquisition of jurisdiction, however. The order from which respondent appealed addressed only the "removal" of the child. Respondent did not claim an appeal from the initial order of disposition following the adjudication. See MCR 3.993(A).

Because respondent did not claim an appeal or otherwise challenge the adjudication or the initial dispositional order, the majority erred by addressing the propriety of the adjudicatory decision in its initial opinion. The new opinion attached to this order eliminates the Court's references to the adjudication. To the extent that respondent seeks reconsideration based on this Court's holding or findings regarding the adjudication, respondent's motion for reconsideration is GRANTED.

Respondent also seeks reconsideration based on the trial court's alleged failure to consider "actual evidence" provided by the DHHS regarding the fitness of respondent's proposed placement. As a majority of this Court previously determined, the evidence submitted by the DHHS included a home study which revealed serious concerns regarding the fitness of the proposed placement. This evidence sufficed to prevent placement of the child in the home respondent proposed. Similarly, respondent's additional arguments in support of reconsideration do not demonstrate "a palpable error by which the court and the parties have been misled," or that "a different disposition of the motion must result[.]" MCR 7.215(I)(1); MCR 2.119(F)(3). Accordingly, other than regarding the Court's references to the adjudicatory decision, respondent's motion for reconsideration is DENIED.

The motion of the Children's Law Section of the State Bar of Michigan for leave to join as amicus curiae in support of respondent-father's motion for reconsideration is GRANTED.

_____
Presiding Judge

Maldonado, J., would GRANT the motion in whole.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

_____
June 15, 2023
Date

_____
Chief Clerk

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. K. DIXON, Minor.

FOR PUBLICATION
June 15, 2023
9:10 a.m.

No.   363388
Genesee Circuit Court
Family Division
LC No.   21-137495-NA

Before:  GLEICHER, C.J., and O'BRIEN and MALDONADO, JJ.

GLEICHER, C.J.

ON RECONSIDERATION

Within days after AKD's birth, the Department of Health and Human Services (DHHS) petitioned for his removal from his mother and for the termination of her parental rights.  The DHHS knew that the current respondent was the child's likely father.  Father expeditiously established his paternity.  Yet the DHHS neglected to file a petition naming him as a respondent for 15 months after his child was placed in foster care.  During the interim, father urged the court to place his son with PM, fictive kin.  The court rejected this option, and father now appeals the court's "removal" order.

The DHHS's delays are deeply troubling.  But because the court reasonably determined that the fictive kin suggested by father was an inappropriate placement, we must affirm.

## I.  BACKGROUND

On June 7, 2021, mother gave birth to AKD.  Father was incarcerated at the time of AKD's birth and was not present to immediately sign an acknowledgment of parentage (AOP).  This prevented mother from placing father's name on the birth certificate.  MCL 333.2824(2).  Mother named the child after father, and before the preliminary hearing on June 16, the DHHS identified father as the putative father.  Father remained incarcerated but appeared at the virtual hearing and was represented by counsel.  The referee advised father that he had "been named as the putative father" and that the court could "work on getting [a DNA test] set up for him."  The referee further advised father that he had 14 days "to start working with us to establish paternity if this is something you would like to do."  Father requested a DNA test and asked for an adjournment until

-1-

the DHHS served the petition on him. The referee indicated that the court would keep father "informed of everything" but the DHHS could not include him as a respondent or grant him the rights of a legal parent until paternity was officially determined. The court further noted that although father was incarcerated and could not take physical custody of the child, once paternity was legally determined, "he may have family . . . that would be appropriate to care for the child." At the close of the hearing, the court approved the DHHS plan to place AKD in the licensed foster home where his two older half-siblings had been placed.

By September 29, 2021, DNA testing established father as AKD's biological parent. Counsel for the DHHS stated, "I also think that [father] did sign an [AOP] and that we are just waiting to file it with the Court or waiting to get it from the jail." Father's counsel agreed with the DHHS's assessment, noting that father was "kind of in limbo right now because he's signed the AOP and I'm told it's been sent to Lansing, so he's not officially a father yet." DHHS's counsel expressed the department's intent to file an amended petition naming father as a respondent, but only for purposes of jurisdiction and removal, not termination. Father's counsel requested an adjournment "so that we can make sure everything is done correctly." The court proceeded to take evidence regarding mother's case and terminated her parental rights to AKD. At that termination hearing, a DHHS caseworker testified that the foster family was willing to plan for AKD permanently and to adopt him.

By the next hearing on November 23, 2021, the DHHS had received the AOP, submitted it to Vital Records, and was awaiting return of "the official copy." The DHHS still had not filed an amended petition naming father as a respondent. By this time, AKD was 5½ months old.

The next hearing was not conducted until February 22, 2022—8½ months after AKD's birth and five months after biological paternity had been established. Inexplicably, the DHHS still had not named father as a respondent or filed an amended petition seeking jurisdiction as to father. MCR 3.965(B)(8) required the court to "advise" father of his "right to seek placement of his . . . child[] in his . . . home." However, father remained incarcerated with an earliest release date of October 2023, unable to take physical custody of his child. His counsel argued:

> Well, your Honor, since – since he's now the legal father and there are no allegations in any petition against him, he can place the child where he wants. So, um, I think that they need to ask him where he wants the child to go, and the child needs to go there.

The DHHS caseworker recommended keeping AKD in his current placement as he was "doing very well," had been in the care of the foster home "since he was a very little baby," and was placed with his two older brothers. Moreover, the caseworker had "reached out to [father's] family, and no one was interested in placement of the people that [father] gave me to get in contact with." Father's counsel inquired if father could identify other potential placements. Counsel argued that as no allegations had been levied against father, if he identified a willing placement, "they don't have to go through any background checks" and the DHHS "doesn't get to refuse to put the child there . . . . He can place wherever he wants."

The court placed father under oath. The court advised father that it would prefer that only family members be recommended for placement but would consider "if there were other

individuals that you believe would be appropriate." However, the court rejected counsel's position that placement would be automatic, indicating that the DHHS would evaluate any recommended placement. Father asked the court and DHHS to consider placement with his "significant other," PM. The DHHS acknowledged that father had identified PM as a potential placement and father stated that PM had expressed willingness to take custody of AKD. The court ordered the DHHS to evaluate PM for potential placement and to investigate initiating virtual visits for father and his son.

On May 10, 2022, the DHHS presented its recommendation about placement of AKD with PM. The caseworker reported:

> [W]e did conduct a home study at the home. Um, and honestly we do have some concerns relating to placement of [AKD] in this home. Although [PM's] intentions are very – are very good, um, the history that comes with this I do not believe will put [AKD] in a safe environment. [PM] has known [father] for approximately five years. They have been in an on-and-off relationship. They were engaged at one point prior to this most current incarceration and split up due to [father] cheating on [PM] with [AKD's mother]. Um, they did reconcile while he – and then now he is in prison again for I believe approximately two more years.
>
> [PM] has nine instances of CPS history over a fourteen year span, um, approximately 2004 to as – as close as 2018. These investigations did not all directly involve her, but she was named in all of these investigations due to affiliation with the people or regarding herself. These were allegations that included substance abuse and physical neglect.
>
> Um, there's also question that [PM] has communication with the birth mother's mother, which is a little confusing to explain, but we have gotten numerous reports that they talk on a regular basis; and there is concern that, if [AKD] was placed in this home, that he could have unauthorized and possibly unsafe connections with his birth family, birth mom. Birth mom currently knows that this is possibly going to take place and has made threats already to [PM]. And, when I visited with [PM] at her home, when we did some – brought [AKD] to meet her, um, she did state that she believed that, within a couple of weeks, CPS would already be called to her house due to how many people are so apparently against this placement.
>
> . . . [S]o honestly, she hasn't – [PM] hasn't had any CPS history investigations recently, but she also hasn't had any children in her home so it – she does say that she is sober for ten years, but there was a substance abuse issue at the time.

The DHHS requested that AKD be kept in place and sought another adjournment as it still had not filed a petition to name father as a respondent despite that the child was then 11 months old.

The child's LGAL concurred with the DHHS recommendation. She cited further concerns with placing AKD with PM:

Financial concerns – my understanding is that [PM] does not own or rent her own home; she lives with her mother. It's a two-bedroom home. She received Social Security Disability of about eight or nine hundred dollars a month. She does have a car payment and insurance, so I mean that – she had to pay for her own necessities, so I'm very concerned financially. She would not be receiving, you know, financial support for [AKD].

Um, I'm also very concerned about the CPS history that was reported. My biggest concern is that there is no relationship between [AKD] and [PM], none; and he is absolutely thriving in his current placement where he lives with his two siblings. They are in the process – I don't know if they have already been adopted by the foster parents or not, but that process is ongoing. This is an extremely stable environment and my concern is is [sic] that it's so important with little ones – the first two years of a child's life it's just critical to form those safe attachments, those bonds. I mean, that really sets the foundation for a child's emotional stability and well-being. So I'm absolutely terrified of this, you know, moving him at this point. If it's not to place back with parent, I don't – I – I worry about that.

I'm also very concerned about the safety of – of [AKD] being placed with [PM] as referred. My understanding is that mother has made threats during all the drama that went on between she and father. Um, I mean this gentleman has been in prison; and the relationship between [PM] and the dad five – either five years on and off, I don't know what the intention and motivation of [PM] is to have this one-year old in her home; that's a lot.

So there are just so many red flags; and I – I don't believe that dad has, um, made a decision for a placement that is either appropriate or safe; and, while a parent does have the right to direct place, that placement does have to be an appropriate one. And I don't believe, you know, that keeping [AKD] with – in this placement where he is now, dad can still, you know, maintain that relationship with [AKD] and the – you know, the communication or whatever. We can – we can still work on that. So it wouldn't be denying dad a relationship . . . .

Father's counsel objected that as a nonrespondent, father had "the right to make the direct placement" and he had selected PM. Counsel asserted that although PM had been "involved" in CPS investigations, those cases did not "have anything to do with her." PM understood her duty to keep AKD safe, even from his biological mother. Father's counsel then asserted:

It's also my understanding that the foster homes [sic] – in talking with the caseworker, had either entered a [30]-day notice for removal of this child or were seriously considering putting in a [30] day notice to remove this child. I think it was that they had put in the [30] day notice.

Counsel continued:

I mean they're already talking about we want to make him a respondent because we don't like the placements that he has directed. I mean, that is no reason to make

-4-

a father a respondent. And next what they'll do is they'll say well he's in prison and he's been in prison so long he doesn't have a relationship with the child so we want to terminate his rights. So the only way [father] is going to be able to have a relationship with his child is if the Court grants this placement; you know, higher courts have said he has the right to make that direct placement. So I ask your Honor to go ahead, and make this direct placement so that [father] can have a relationship with his child.

The attorney for the DHHS retorted that "the foster parents did not put in a notice for [30] days . . . ." Indeed, no notice appears in the lower court record and it was never mentioned again. In fact, the final court report provided to this Court, prepared in December 2022, indicates that the foster parents were still willing to adopt AKD if reunification efforts were not successful. The trial court rejected father's request and retained AKD in his foster placement, citing its duty to ensure the safety of the child and his home.

Two weeks later, the court conducted another review hearing, and still the DHHS had not filed an amended petition alleging father's unfitness. The court notified father that he could present additional names for the DHHS to consider for placement of his child. The court continued AKD's placement with his foster family.

Finally, on May 25, 2022, the DHHS authored a supplemental petition naming father as a respondent in these child protective proceedings. As grounds for jurisdiction under MCL 712A.2(b), the DHHS asserted that:

The parent . . . when able to do so, neglected or refused to provide proper or necessary support, education, medical, surgical, or other care necessary for the child(ren)'s health or morals, or he/she has subjected the child(ren) to a substantial risk of harm to his or her material well-being, or he/she has abandoned the child(ren) without proper custody or guardianship.

The home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of the parent, guardian, nonparent adult, or other custodian, is an unfit place for the child(ren) to live.

The DHHS asserted that it was "contrary to the welfare of" AKD to be placed in father's home because father was "unable to provide proper care and/or custody" during his incarceration and "[a]ssessments have been completed on the individuals provided by [father] for direct placement and the placement was denied by this court." The DHHS noted that father's earliest release date is October 19, 2023, but his maximum release date is not until 2028. The petition detailed father's criminal history, which included home invasion, assault by strangulation, possession of cocaine, and illegal possession of weapons, spanning from 2008 through 2021. Regarding his attempts to directly place AKD, the DHHS noted that father identified two relatives who were unwilling to take custody of the child as well as PM, who was assessed and deemed an inappropriate placement. The DHHS therefore requested an order removing AKD from father's care and taking jurisdiction of the child as to father.

The petition seeking jurisdiction of father was authored on May 25, but was not mentioned at the court's July 19 review hearing. Rather, the DHHS detailed its attempts to arrange Zoom parenting time and the prison's resistance until father's name was added to the child's birth certificate. The court ordered the DHHS to continue these efforts. Before father was designated a respondent, the caseworker had given father "some worksheets related to children and trauma." No other services had been provided.

The DHHS still had not served the petition on father before the court's next hearing on August 30, 2022, requiring an additional adjournment.

It was not until September 20, 2022, a full year after father had been identified as AKD's biological parent, that father was finally made a respondent to these proceedings. One year after DNA testing proved respondent-father's biological connection to his child, the court finally considered his parental fitness and again took jurisdiction over the child. Fifteen months after the child's birth and placement in foster care, the court officially "removed" him from respondent-father's care and custody. The DHHS conceded at this hearing that virtual parenting time still had not been arranged because the caseworker did not know how to have respondent-father's name added to the birth certificate. Respondent-father's attorney incredulously directed the caseworker to the instructions printed on the AOP form and argued that this should be a non-issue: "There's definitely no question that mom believes him to be the father, since they have the same name."

Respondent-father wasted no time and filed this claim of appeal from the court's removal order on October 11, 2022. The latest court report in the lower court record provided to this Court was authored on December 20, 2022. It notes that father had yet to be provided virtual parenting-time sessions, although the caseworker had sent recent pictures and updates regarding AKD. Respondent-father advised that he had "completed an advanced substance abuse program" while incarcerated and was willing to complete any other services required of him. The report listed the services father would be obligated to complete as including "Mental Health Counseling, Parenting Education, Substance Abuse Treatment, Psychological Evaluation, Housing, and Employment." However, none of these services or alternatives had been made available to father in the prison. At that point, the foster parents were "supportive of the goal of reunification," but were still "willing to provide long term permanency . . . if reunification does not occur."

## II. ANALYSIS

"It is well established that parents have a significant interest in the companionship, care, custody, and management of their children. This interest has been characterized as an element of 'liberty' to be protected by due process." *In re Brock*, 442 Mich 101, 109; 499 NW2d 752 (1993). See also *In re VanDalen*, 293 Mich App 120, 132; 809 NW2d 412 (2011) (quotation marks and citation omitted) ("[P]arents have a due process liberty interest in caring for their children."). "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents . . . ." *Santosky v Kramer*, 455 US 745, 753; 102 S Ct 1388; 71 L Ed 2d 599 (1981).

The state may not infringe a parent's "right to direct the care, custody, and control of his children . . . without *some* type of fitness hearing." *In re Sanders*, 495 Mich 394, 414-415; 852 NW2d 524 (2014). Here, the court and the DHHS bypassed father's right to direct the placement

of his child by delaying his legal ability to assert that right. Mother was sure of paternity at birth as she named AKD after his father. AKD was only three months old when DNA analysis established father's parentage. Father then immediately signed an AOP, but an "official copy" required to name father as a legal parent was delayed through no fault of his own. AKD was in care for almost 15 months before the DHHS served a petition naming father as a respondent. Even when the DHHS finally authored a petition against father shortly before AKD's first birthday, it waited three months to serve it. There is no legitimate excuse for the DHHS's failure to timely declare father a respondent. Such delays run counter to the purpose of the Juvenile Code, which is the protection of children. *In re Jagers*, 224 Mich App 359, 362; 568 NW2d 837 (1997). And these delays impinged on father's constitutional rights.

Father contends that before he was officially named as a respondent in the child protective proceedings, he possessed an unfettered right to place his child with anyone of his choosing. MCR 3.965(B)(8) confers a right to unchecked direct placement only in the nonrespondent parent's "*home*." (Emphasis added.) But it has long been the law that a parent may "entrust the care of their children for extended periods of time to others" "without court interference by the state *as long as the child is adequately cared for*." *In re Weldon*, 397 Mich 225, 296; 244 NW2d 827 (1976) (opinion by Levin, J.) (quotation marks and citation omitted), overruled in part on other grounds as stated in *Bowie v Arder*, 441 Mich 23; 490 NW2d 568 (1992) (emphasis added).

The earliest possible date that father could have planned for AKD was September 2021, when DNA testing established his paternity and he signed an AOP. But father was not immediately available to ensure that his selected custodian could adequately care for AKD. AKD was already in foster care by that time, as ordered by the court when the child was removed from his mother's care. And although father quickly designated PM as his son's custodian, evidence submitted to the court by both the DHHS and the GAL supported that AKD would not be "adequately cared for" in PM's home.

Our dissenting colleague argues that once father directed that AKD be placed with PM, the circuit court had no legal authority to leave AKD in foster care. Although we respectfully disagree, we readily admit that the law regarding this issue is difficult to parse and that no clear guidelines exist to assist courts confronted with similar situations. We frame the question presented as: what procedural protections must be afforded to protect the constitutional right of a late-identified parent to select a relative or fictive kin placement when the child is already in the care and custody of the state? Because the accuracy and legitimacy of a decision to deprive a parent of the right to control his child's custody is fundamental, we submit that the proper inquiry weighs the interests at stake under the due process framework established in *Mathews v Eldridge*, 424 US 319; 96 S Ct 893; 47 L Ed 2d 18 (1976), which assists courts in making similar assessments.

We begin by reviewing the statutes and court rules governing the removal of children from their parents' custody. MCL 712A.2(b) provides for jurisdiction over a minor, in relevant part, as follows:

> Jurisdiction in proceedings concerning a juvenile under 18 years of age found within the county:

(1) Whose parent . . . when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. As used in this sub-subdivision:

\* \* \*

(B) "Neglect" means that term as defined in . . . MCL 722.602.[1]

(C) "Without proper custody or guardianship" does not mean a parent has placed the juvenile with another person who is legally responsible for the care and maintenance of the juvenile *and who is able to and does provide the juvenile with proper care and maintenance.*

(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in. As used in this sub-subdivision, "neglect" means that term as defined in . . . MCL 722.602. [Emphasis added.]

MCL 712A.13a(2) governs the authorization of a petition for jurisdiction:

If a juvenile is alleged to be within [MCL 712A.2(b)], the court may authorize a petition to be filed at the conclusion of the preliminary hearing or inquiry. The court may authorize the petition upon a showing of probable cause that 1 or more of the allegations in the petition are true and fall within [MCL 712A.2(b)]. . . .

AKD was without proper care and custody at his birth due to his mother's substance abuse and neglect and his putative father's incarceration. When removal first became necessary, neither parent placed AKD into a guardianship or with a responsible adult under a power of attorney. The court properly approved AKD's removal from his mother and placed him in foster care.

---

[1] MCL 722.602(1)(d) defines "neglect" as

harm to a child's health or welfare by a person responsible for the child's health or welfare that occurs through negligent treatment, including the failure to provide adequate food, clothing, shelter, or medical care, though financially able to do so, or the failure to seek financial or other reasonable means to provide adequate food, clothing, shelter, or medical care.

Had AKD been placed with a relative instead of in foster care, the DHHS would still have been obligated to assess the safety of that placement.[2] MCL 712A.2(b)(1)(C) recognizes that placement with a relative, standing alone, does not automatically establish that a parent has provided proper care. Rather, a parent is obligated to place her child with a person who is "legally responsible for the care and maintenance of the juvenile and who is able to and does provide the juvenile with proper care and maintenance." Once a child has been placed, a court "must review the placement order" "[o]n motion of a party," and may modify it if doing so "is in the best interest of the child." MCR 3.966(A)(1).

Phrased somewhat unartfully, this Court has observed that "if a parent places a child in the care of a relative whose home is not unfit, then the 'without proper custody or guardianship' language is not satisfied." *In re Baham*, 331 Mich App 737, 748; 954 NW2d 529 (2020) (emphasis omitted). The converse is equally true. If a parent places a child in the care of a relative whose home *is* unfit, the parent has not provided proper care and custody. This is why MCR 3.965(C)(5) mandates that even when a child is placed with a relative, the court must order the completion of a home study within 30 days and may order the completion of a criminal record and central registry check within a week.

We wholeheartedly concur with our dissenting colleague's position that a fit parent has a constitutional right to place his child with anyone he deems appropriate. And father was not even preliminarily determined to be unfit until his child was more than a year old. But AKD was under the DHHS's care and supervision by the time father had the legal ability to place the child. Father's incarceration and his absence at the child's birth put him in the unenviable position of being unable to directly place his child without DHHS input. When he was able to direct AKD's placement, the child was 5½ months old and living in a stable foster family placement.[3]

The dissent contends that *Sanders*, 495 Mich at 421, compels the conclusion that before being adjudicated unfit, father had the constitutional right to direct the DHHS to immediately remove AKD from his foster care placement and to place the child with PM, and that the DHHS was not entitled to curtail or delay that placement. In our view, *Sanders* does not stretch quite that far.

In *Sanders*, the Michigan Supreme Court held that a parent must be adjudicated as unfit before the state may infringe his constitutionally protected relationship with his child. *Id*. at 415-416. A dispositional hearing conducted within the proceedings involving an already adjudicated

---

[2] MCL 712A.13a(1)(j) was amended by 2022 PA 200, effective October 7, 2022, to include within the definition of "relative" individuals who are "[n]ot related to a child within the fifth degree by blood, marriage, or adoption but who has a strong positive emotional tie or role in . . . the child's parent's life if the child is an infant, as determined by the [DHHS]." This new definition might encompass PM. But at the time AKD required placement, such "fictive kin" did not fall within the definition of relative.

[3] We assume without deciding that father was legally entitled to make placement decisions by November 21, 2021, when the DHHS received the signed AOP and submitted it to Vital Records.

parent does not adequately protect the unadjudicated parent's right to custody, the Court held. In analyzing the substantive and procedural constitutional interests at play, the Court applied the three-part balancing test described in *Eldridge*, 424 US 319.

In *Eldridge*, 424 US at 323-324, the United States Supreme Court considered whether a state agency may terminate a recipient's social security disability benefits without affording an opportunity for an evidentiary hearing. The Court painstakingly described the "elaborate" web of procedures preceding a final decision terminating disability benefits. *Id*. at 337-339. The Court also analyzed the constitutional adequacy of those procedures under a three-factor balancing framework:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. [*Id*. at 335.]

The Supreme Court concluded that the Due Process Clause did not mandate a hearing before the initial termination of a claimant's benefits. *Id*. at 349. In large measure, the Court rested its decision on "the fairness and reliability of the existing predetermination procedures," which entailed a low risk of error. *Id*. at 343-345.

In *Sanders*, the Michigan Supreme Court applied the *Eldridge* factors in assessing the process due an unadjudicated parent in maintaining full custody and control of a child subject to an adjudication order involving the other parent. As to the first factor, the Court readily recognized "the importance of the private interest at stake . . .—a parent's fundamental right to direct the care, custody, and control of his or her child free from governmental interference." *Sanders*, 495 Mich at 415. The Court specifically acknowledged that "[w]ith respect to the second and third *Eldridge* factors, it is undisputed that the state has a legitimate and important interest in protecting the health and safety of minors and, in some circumstances, that the interest will require temporarily placing a child with a nonparent." *Id*. The nonrespondent father in that case had "requested that the children be placed with his mother, the children's paternal grandmother." *Id*. at 421. That request should have been honored, the Court held, because "[a]s long as the children are provided adequate care, state interference with such decisions is not warranted. *Id*.[4]

As in *Sanders*, father here enjoyed a constitutional right to direct the care and custody of AKD before he was adjudicated. But in *Sanders*, as here, the legal analysis does not stop with that observation. When a child has been placed into care by an unchallenged order of the court, the state has a legitimate and important interest in protecting the child's health and safety. When

---

[4] We note that a court's consideration of the fitness of a proposed placement is also consistent with *In re Weldon*, 397 Mich 225, 296-297; 244 NW2d 827 (1976) ("There is no evidence that [the child's] grandmother . . . did not adequately care for [the child] during the periods [the parent] was away from home.").

-10-

vindication of an unadjudicated parent's custodial right will necessarily involve a court-ordered custodial change and the elimination of state custody, the state's interest permits the maintenance of continued, temporary placement while an investigation is conducted to ensure the appropriateness of the new placement.

We have no difficulty concluding that an abrupt removal of AKD from his foster care placement would have triggered a substantial risk of emotional harm to the child, even if the proposed placement were ultimately determined to be fit. AKD was only 5½ months of age when father became eligible to direct his care and custody. The court and the DHHS had an interest in protecting him from an unsafe and emotionally damaging custodial transfer, which meant conducting some investigation into the appropriateness of father's proposed placement. See also the *Children's Foster Care Manual*, FOM 722-03B, p 3 (providing that "[s]afety assessments, safety planning (when appropriate), and background checks must occur for all unlicensed homes prior to placement"). We note that after placement, even relatives must proceed through the foster care licensing process. *Id*. Before a child is placed with a relative, the DHHS must review the individual's "[p]rior CPS history" and conduct a "Central Registry check." *Id*. at 7-8.

We sympathize with father's position but under the circumstances presented here, father's right to control the custody and care of his child must yield, at least temporarily, to the state's interest in preventing upheaval for AKD, a vulnerable child who has been in care with the same foster family for nearly two years. Balancing the interests as *Eldridge* supports that we do, we conclude that in this case, the court did not err by *initially* refusing to transfer AKD's custody. But as discussed below, the evidentiary basis for this refusal was not well fleshed out, and on remand we direct that the DHHS conduct a second and more detailed home study of PM forthwith.

Going forward, the court and the DHHS must tread carefully to avoid repeating their mistakes.

First, the DHHS must reevaluate PM as a placement for AKD and place more details of its investigation into the record. Prior CPS investigations do not automatically preclude consideration of a relative caregiver, and PM likely now falls within that category. The DHHS stated that PM had "nine instances of CPS history" between 2004 and 2018. But the DHHS did not differentiate between "investigations due to affiliation with" other subjects and those "regarding herself." The DHHS did not indicate whether those reports were substantiated. It did not describe whether services were provided and if so of what type, and whether PM benefitted. See *Children's Foster Care Manual*, FOM 722-03B, pp 7-8. Moreover, the DHHS failed to consider PM's years of sobriety since these investigations. While the DHHS expressed concern that AKD's biological mother could pose a safety threat in this placement, it failed to recognize that a safety plan could be formulated to protect the child. *Id*. at 3.

Second, the lack of parent-child contact in this case violates the Juvenile Code. MCL 712A.13a(13) and MCL 712A.18f(3)(c) require the court to permit "regular and frequent parenting time" when a child is removed from a parent's care. The court recognized this duty and ordered the DHHS to arrange video visits for the incarcerated father and his young son. As of December 2022, those visits still were not occurring, contrary to court order. If these visits still have not been scheduled, that must be rectified immediately. This may require a court order directly to the prison.

Third, it appears from the record that little has been done to secure services for father even after he was named as a respondent.  Father reported that he had completed a substance abuse program and a caseworker vaguely described material she had provided about children and trauma. At the very least, the caseworker must provide available workbooks for father to complete, as has been done in many other cases involving incarcerated parents.  MCL 712A.19a(2) excuses the DHHS from making reasonable efforts toward reunification only under very limited aggravated circumstances.  The mere fact of imprisonment is not one of them.  And the DHHS's efforts have been grossly inadequate thus far.  Accordingly, although we are affirming the court's removal of AKD from his home, we do not condone the court's and DHHS's treatment of father or the violation of his constitutional rights.

We reluctantly affirm.

/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien